We'll hear argument first this morning in Case 18-481, the Food Marketing Institute v. Argus Leader Media. Mr. Young? Mr. Chief Justice, and may it please the Court, before I turn to why the Court should jettison the National Park's definition of confidential and instead restore that word's plain meaning, as used in Exemption 4 of the Freedom of Information Act, let me address justiciability. Respondents brief express doubts about redressability, but redressability and the other two requirements of Article III standing are established here. First, our injury, in fact, is the disclosure of our members' store-level sales information that they keep secret. Not if the government decides that it doesn't want to give it. We already have a case that says if the government voluntarily chooses to disclose, you're stuck. You can't appeal. So here the government chose not to appeal. It chose, by definition, to turn it over. Why aren't you bound by that decision? We're not bound for it because the intervention that we successfully moved in the District of South Dakota made us a proper party. We had an interest that allowed us to intervene. But the – if you had been a part of the – if you had been the original asker, we have a case that says, Crystal City, that if the government chooses to turn it over, you can't appeal. And the government did not make that choice. So there are really five things. Well, but they haven't made the choice on this exemption. They've made the choice because of a new law. Isn't the proper course for them to go back to the district court with a motion for reconsideration or for them to petition the court or for you to go to the court or for our – or for someone else to go to the court and say they have to turn it over? No, Your Honor. The government in this case made a number of steps that make clear that the district court makes clear that our addressability is not only likely but certain. Now, let me start, because standing at the time of the – Well, it's not certain until the district court relieves them of the earlier judgment, telling them that Exemption 3 didn't apply. Well, that premise, I think, is a mistaken one. And if you look at pages 30 to 31 of the government's brief, for example, they make clear that they are not pressing an Exemption 3 argument here. They are not requiring this Court or even asking this Court to reconsider the Section 2018C argument on which the Eighth Circuit's first judgment. But that's the basis for their refusal to turn it over now. Well, no. The basis for their refusal to turn it over now is an Exemption 4 basis, that the information – Well, they can speak for themselves, but I thought – Agreed.  But they can speak for themselves. But they can't speak for the Court to turn it over. There are a number of things that differentiate this from a situation like that. For example, instead of voluntarily disclosing it, which would be what they would do if they decided to follow it, they facilitated our intervention by alerting us to the possibility of judicial intervention. They then, when we did intervene, told the district court, they told the Federal court, as they've told this court, we will not release that information unless a final judgment in the judicial system requires it. Do you understand the government to be firmly committed to not releasing the information unless required to? Yes, that's what I understand. I noticed them on your side of the lectern. And I'll speak for them, but that's what they have represented not only to the district court, but to this Court. Now, of course, they remain free to change their mind. And that would be a different situation. But the question for standing at the time when we invoked the appellate jurisdiction of the Federal courts was, well, we'd have a likelihood of relief, and the answer is yes. And right now, based on the Solicitor General's brief, that was the thing that my friend on the other side invoked in his brief to this Court. That would be a mootness question. And, of course, mootness can be established only if it's impossible that this Court's reversal would give us meaningful relief. The opposite is true. If this Court reverses, the only thing that will lead to our information certainly being made public will be destroyed. And that's why all the requirements of Article III standing are met. Sotomayor But it won't be destroyed, because they have a 2018C argument. Stewart Well, the fact, as in Milner, in which there was an Exemption 7 argument pending, this Court took it to decide Exemption 2, sure, there's a 2018C argument that in theory would be pending if this Court were not persuaded by anything we say there's been an intervening change in the law. Sotomayor They're wrong on 2018C. They have to comply with the extent judgment under Exemption 4. Stewart No. I disagree, and I'll allow my friends from the government to explain their position, but they're making an Exemption 4 argument based on the what they say in Part B2. Sotomayor They're trying to piggyback their appeal on you. Stewart No. I disagree with that as well, Justice Sotomayor. I think what the government is saying is we've had four decades of the highest level promise of confidentiality that the government can make to its citizens, and that is that this kind of confidential information, we will protect the confidentiality of it. And for that reason, even if the motivation that they had back in 1979 for starting down that process turns out to be wrong, nonetheless, the promise of confidentiality which Exemption 4 and not Exemption 3 protects remains. Ginsburg But wasn't the whole purpose of Foyer says disclose, and one of the concerns was the government official, for one reason or another, doesn't want to disclose. There have been cases of a captive agency, for example. So to say the government can control this by making a promise that it won't disclose, that seems to run counter to the whole idea of Foyer. Stewart Well, it would perhaps run counter to the idea of Foyer if it were the kind of information that was about the government's own doings, or even conceivably something that's not presented here, if there were willy-nilly, ad hoc promises of confidentiality in which low-level employees could wave a wand and say, confidential, confidential. But I think that what this Court has repeatedly said, I'll mention the Department of Justice v. the Reporters' Committee case, where the Court says, yes, Foyer's basic policy focuses on the citizens' right to be informed about what their government is up to. That's a direct quote. But then the Court immediately says that purpose, however, is not fostered by disclosure of information about private citizens that is accumulated in various governmental files, but that reveals little or nothing about an agency's own conduct. And so here what we see is a choice. When a SNAP beneficiary receives an allocation from the government, their choice to shop at this grocery store rather than one across the street is in no sense government action. It is the unmediated decision of third parties. It tells you, in other words, an awful lot about Mrs. Smith or Mr. Jones and their choices, and it tells you a lot about how those two grocery stores market and sell and what their selection might be. Breyer. I don't doubt that you're heard. I do — I can't quite figure out how this mootness thing works. It seems to me there are two laws, A and B. Well, A is the one you're interested in, and B is this other one that stops them from — maybe — from giving out information. Now, here you're attacking A, so I'm asking, does A cause you injury? Not, does B cause you injury? Now, if B stops them from giving out the information, if you win on A, you don't get it. If you lose on A, you don't get it. If B doesn't stop them from giving out information, if you win on A, you get it. If you don't — it works — the result is the same no matter how we decide your case. We just don't know about B. Now, if I got that right, and if I've got that right, I don't know a standing case right in point or a mootness case right in point. I'm not sure what to do. Well, if I'm understanding you, Justice Breyer, I don't think it raises either one of those justiciability questions, because the Court can have in reserve many grounds that the lower courts, for example, may not have addressed. In Milner, I mentioned Exemption 7 was still there. Now, if Exemption 7 was well taken, Exemption 2 wouldn't have been necessary. The Court granted in Milner to resolve what Exemption 2 meant, and it granted in this case to resolve what Exemption 4 means. And if you do it, and you rehearse — Sotomayor, the problem with that, Miller, is, and the big difference, is that the government chose not to appeal the ruling on Exemption 4. So it acceded to turning it over under that exemption. And under Crystal City, we said, they or you can't appeal that. And you admit if that was all of it, and they had chosen to turn it over, you would get it. So now the question is, can they and you do an end run around Crystal City by simply saying, no, we're really not going to turn it over because of something else, but we really didn't want to challenge Exemption 4 at all, and we were going to turn it over because we didn't really think the pricing information was confidential back then. But now we think we're going to change our mind. This is how I'm reading the argument. And so we're going to piggyback on a private entity raising an issue that we should have appealed on. Justice Sotomayor, I don't believe the government's piggybacking at all. They're here as an amicus, and it is we, the Food Marketing Institute. Sotomayor, but why can you, without getting stuck in Crystal City? Well, because they've said, I won't turn it over, but they're bound to turn it over right now by a judgment below, and they haven't asked the court below to reconsider that judgment. I think it's as simple as they raised Exemption 3, they lost. A change of law has happened. They should have moved for reconsideration, and they didn't. So why aren't they stuck? Because we intervened, and the opportunity to conclude that we are not a proper party to be able to make any of these merits inquiries has long since passed. Mr. Young, may I ask you a question about your substantive standard? You, at some points in your brief, say that the question is simply whether the information is private, private being a synonym for confidential. At other points in your brief, you talk about whether the information is kept private. To me, those two things are a little bit different, that the idea of keeping something private is not just that the information isn't out there in the world, but that you're doing something to make sure that the information doesn't get out there in the world. So which do you think is the right approach in this case? I'll readily agree with the latter. Our argument is not that simply marking something or stamping it confidential does the trick. We've had 27 years with the D.C. Circuit's critical mass case, which essentially adopts the position that we think correctly defines the entirety of Exemption 4. And in critical mass cases, when a party wants the release of some information that a party like us might say, that's our confidential commercial information, more is required and you can be held to fail your Exemption 4 argument if you don't illustrate how you protect the information. So, for example, what is relevant and what was asked even in this very case in which these questions were presented to the trial court, do you bind it with nondisclosure agreements? Do you have security in place so that it limits the number of people, even internally, who have access to it? How do you make sure that it is not supplied accidentally in litigation, for example? How, in other words, do you make sure that it doesn't become public? Have you made sure that comparable information has not been made public in other forms? And so there are critical mass cases, decisions from the D.C. Circuit courts and from the Tenth Circuit courts that apply that, that look to those exact types of questions and say, well, we can find something rather like this in publicly available information already. Your Exemption 4 argument is false. Sotomayor, So how does that dovetail with the SG's position, that if they ask you to turn over something confidentially, and you seem to be arguing that earlier, that that's enough, that that makes it confidential? Because you've just said to me something quite different, which is it's not the government's request or promise to keep it confidential, but is it in fact kept in confidence the way you've defined it. So how do you dovetail the two? Stewart. Well, I would say that even if the government gives us a promise of confidentiality that fits within the definition of what confidential is, we now have given something to the government in confidence. If we nonetheless publish it, if we're sloppy with it, if we release it in some other way, then we have breached the confidentiality ourselves, and I would argue that someone like that is no longer protected by how the government's overlay is really not necessary to this case. It's a manifestation of what confidentiality is. But only a point of evidence, not a point that binds. I guess. I'm not sure what a point of evidence means. Sotomayor, you say a manifestation. A district court judge could look at that as among many factors. Yes. I would say that if the government, in a proper form, if the government binds itself here through notice of confidentiality. If you give this information to your employees, there's no promise of secrecy. Well, Landano defined what confidential meant also, and it recognized that confidential does not mean that nobody knows it. It means that you have to keep it within a limited universe. Mr. Chief Justice, if I may reserve the balance of my time. Thank you, counsel. Mr. Yang. Mr. Chief Justice, and may it please the Court. Before I address the merits, I'd briefly like to address justiciability and be clear. The government will not release the disputed records from 2005 to 2010 if a FOIA exemption applies. So long as the government is not judicially compelled to do so, it will not do so. Petitioner also had Article III standing. That's evaluated at the time they filed the notice of appeal and invoked the appellate court's jurisdiction. Is that true if the other statute here were held not to block the government from releasing it? Yes. You mean, so however the other statute comes out, the government now is saying I didn't get this at the beginning, we're not going to release it even if we have every right to release it. We're not going to release it even if we have every right to do so. It would help to take a look at footnote 5 at page 26 of our brief where we explain there is a policy interest in USDA. If they were writing on a clean slate, going prospectively, that they may well release this information, they said they likely would. However, as we explain in footnote 5, we said if Congress had not amended section 2018, that's an if, the agency might have explored changing its position. It has not changed its position, one. Two, and then we go on to say, to release store-level redemption data collected after such a change. In other words, the data collected before the change, when we have provided an assurance of confidentiality, in notice and comment rulemaking going back 40 years, the government is not voluntarily releasing that. Breyer. I know, but you sounded in that footnote as if you were saying that the reason we're not releasing it is because of new 2018. Well, the reason we're not releasing anything, whether before or after the new 2018 Look at my question. I'm trying to figure out whether I have a question here, and if you're going to tell me, I don't care if 2018 never appeared, doesn't appear, doesn't exist, we still won't release it, which is your right, in the absence of the rule? I would say that's partially right. The reason we're not releasing it is because we have made assurances of confidentiality at pages 30 to 31 of our brief. We explained that that was motivated by section 2018C. So what happens if 2018C now is wiped from the books? Will you release it? As I was explaining, no. As I was explaining on page 30 to 31 of our brief, even if we were wrong about 2018C, the fact that it was reasonable, it was objectively reasonable in light of the government's assurances for 40 years to understand the government to be providing an assurance of confidentiality, and we understand these retailers to have done so, to be relying on that. We are not going to release it as a matter of good government. Sotomayor, you were going to tell me that you were going to be in contempt on the order below. Of course not. The order below, you litigated Exemption 3. Of course not. If we were compelled to do so by a court, we will do so. But if we have discretion to do so But wait a minute. There is no discretion. Let's assume there's no 2018C amendment. You litigated Exemption 3, you lost. You litigated Exemption 4, you lost. You were ordered to disclose. I think there's confusion in the question. 2018C prohibits the government from releasing. It does not. So if 2018C is taken off the table, we still have discretion. And we are exercising our discretion in a matter of good government. No, but I'm sorry. The court has repeated, the court has recognized. Once you didn't appeal, forget about the amendment. You didn't appeal. Would you have had to turn over the material? No. So long as a party is appeal or a party, they became a party, is appealing, this is an indivisible judgment. It's not like a money judgment that you say the government owes $5 and party A owes $10, and if the government, you know, doesn't appeal, it's going to owe $5. This is the same thing. Any party can bring that up, and if the judgment below requiring the government and the general disclosure is taken off the books, we're no longer bound. Perhaps in your remaining time, you could turn to the merits? Sure. We believe that the information here is, the store-level redemption data is confidential because it's reasonably understood in context to have been communicated in confidence and held secret. Now, the government has had 40 years of express assurances of confidentiality embodied in regulations and in an ongoing dialogue with Congress about these regulations showing that the store redemption data was communicated in confidence because we would not disclose it. The first regs. May I ask you the same question? Sure. I ask your fellow counsel, that is, one of the aims of FOIA was to make information public despite official willingness. Yes. I think that's right, and that is certainly FOIA's general goal. But in this exemption, it only targets a particular type of information, not general. It is information that is private information. It's obtained outside the government. It's about private entities that is either commercial or financial. And in that narrow ambit of commercial or financial information, Congress made the policy judgment that when that is reasonably understood to be confidential, it should not be disclosed. If I understand your argument, Mr. Yang, you kind of have two prongs, two ways of saying that something is confidential. One is just like Mr. Young's or something like it, something like it. And the other is this assurances point. Is that right? Those are manifestations. We think the meaning confidentiality Am I right that you are relying here on the assurances point? We are, because we think it's a little more complicated. This is, in our view, an objective test, and you have to take it in context. And the context here is more complicated than a normal Exemption 4 case, because the government's own actions of paying money is intertwined closely with the information submitted to it, which is why we think the easier path. In this context is to where there has been 40 years of notice and comment regulations by a high, high level of government sign-off, right? This has to be the agency administrator that signs off on these. That, where it's objectively reasonable, provides an assurance of confidentiality that When can it be deemed confidential as a matter of law, even without such assurances? I think this confidential question ultimately is a question that requires factual context. You don't know if information is confidential without understanding the context in which it's either treated in the general sphere before it's obtained by the government or understanding how it comes into the government's possession. So there are, we think as a matter of law. Can it be deemed confidential even in cases without government assurance? I'll ask it a different way. Oh, sure, sure. And what factors would determine that? Well, that's the first manifestation of what's confidential. Just to be clear, we think. Do you have any disagreement with Petitioners on how they articulate that first? I don't think so, except that we think you have to take the full context into account. And when you do that here, the inquiry is more complicated. So as I understood your brief, and tell me if I've gotten this wrong, you're basically saying that the first way of showing confidentiality, the non-assurance's way, isn't really met here because what they're seeking to protect is something, is information that essentially the government reveals all the time by virtue of its payments. Is that correct? I think it's close. We're a little bit more agnostic. We think that that is a hard question, and we're not coming definitively down there. Some side questions like, is this exactly what the government is doing? How close is it? These types of nuances, I think, is what Petitioner may be relying on. We may have a small disagreement, but ultimately, I think what we agree on is in light of the 40 years of practice that has occurred here, all we're trying to do is in another FOIA case, CIA v. Sims, that great nations, like great men, should keep their word, and the government is trying to keep its word, given over 40 years in the most official form possible, that we're going to keep this information confidential. And this assurance's point of yours, does it apply only when somebody is voluntarily giving information to the government, or might it apply when somebody is mandated to give information to the government? I think it generally applies. Now, you'd have to look to see whether the government would have authority to the agent, the government official, have authority to make this assurance in a way that's objectively understood to be speaking for the agency, but it can apply potentially in both contexts. There are hard hypotheticals, I think, at some edges. This case doesn't implicate any of them, so I think the Court could just simply cut through the noise and rule quite cleanly. Sotomayor, I'm just going to say one more thing. Mr. Yang, this is somewhat confusing to me. Exemption 3 says Congress gets to choose what should not be disclosed. That it's Congress's choice what the government will view as confidential and not disclose. Now you're bringing the government, the government qua, the executive branch, into deciding what not to disclose under Exemption 4. Doesn't that turn FOIA on its head? Yang, I think if you read back a little bit in the statute, you'll see that Congress says that FOIA does not apply if any of the exemptions apply. Exemption 3 is one of them. It is one way, but it is an independent basis when Exemption 4 applies, and Exemption 4 is what we're talking about here. Sotomayor, so let's go back. If the store does not keep it confidential, can you, by a promise of confidentiality, protect it from FOIA disclosure? I think that would be difficult. The first prong that we rely upon is, the first manifestation, if it is, if I could just finish the sentence, Mr. Chief Justice, if information is customarily not publicly disclosed by those who submit it, so long as there is nothing in context that suggests that they would understand otherwise when it's provided to the government, it would be confidential. Thank you, Mr. Yang. Mr. Loeb. Mr. Chief Justice, and may it please the Court, if the Court reaches the merits here, it should affirm the judgment of the Eighth Circuit. For 45 years, the language of Exemption 4 has been properly construed to require a showing of likely competitive harm. Not only is that competitive harm standard fully supported by the common law that prevailed in 1966 when Exemption 4 was enacted, the standard has also been ratified by Congress for reasons that I will explain. In 1974, the D.C. Circuit adopted the National Parks Test with its two-prong test including the competitive harm requirement. But by 2001, there was a clear judicial construction. Eighth Circuit had adopted the same two-prong test as National Parks. So between 2001 and today, during those 18 years, Congress has enacted 29 statutes endorsing the language of and the provision of Exemption 4, and has effectively amended Exemption 4, thereby ratifying the National Parks Standard. Now, Mr. Loeb, this case strikes me as a lot like Milner, that you have a D.C. Circuit opinion which puts some things into the test that maybe the statutory text does not immediately suggest, and then there is — everybody adopts it, you know, in Milner too. All the courts of appeals had adopted it. Congress had let it remain on the books for quite some time without doing anything about it. Why isn't this the same thing as that, where we did say, no, we're going to go with the text, not with this extrapolation? Loeb, Jr. This context here is very different than Milner. This Court in Milner expressly said there wasn't a judicial consensus supporting the D.C. Circuit's ruling. Also, there weren't multiple statutes that we have here. We have 29 statutes after the judicial consensus enacted which effectively amend Exemption 4, and that certainly was not the case. Ginsburg. As to the consensus, if I can stop you on that point, we're told by the other side that the circuits have been markedly inconsistent in the way they apply the test. So if the D.C. Circuit had ruled one way and everybody said, yeah, this is how we do it, and the decisions all lined up, that would be one thing. But here we're told that they won't verbalize the same formulation, but they apply it differently. Well, I think the key factor is they all adopt the same two-pronged standards of national parks. And in any standard, how it's applied, even terms like fraud, which are well developed in the law, as it's applied to a particular circumstance, there's always going to be some deviation in the courts.  So the competitive harm requirement all require a showing of likely competitive harm, and that is the standard we're saying that has been ratified here. If you look at some of the statutes that we attached in our addendum, they are actually limiting the discretion that's under Exemption 4. So as the SG's brief points out, Exemption 4 doesn't prohibit disclosure. It just says the agency has discretion whether it's disclosed or not. These additional statutes micromanage that discretion. Some of them say that when you have the discretion, you have to withhold. Some say that when you have the discretion, you have to withhold for five years. Some say when you have discretion, you have to ask the private party their view. Those are all – those all could have been codified under Exemption 4, but instead they were codified under separate statutes. But that's just a matter of formalism. This Court has said when Congress actually examines a statute, amends a statute and reenacts it, that you're – that Congress is presumed to have adopted the prevailing judicial construction. That's what this Court said in Lorillard, in Shapiro, and in this term in Helsin. And likewise here, we have all the circuits lined up on the two-prong standards. We have Congress not just addressing the statute once, but 29 times in this 18-year period where they, again, have codified over and over again that standard. Mr. Loeb, along those lines, the other side makes the argument that in Exemption 7, the word confidential is given a different gloss than you'd have us give it in Exemption 4. I'm sure you would like an opportunity to respond to that. Correct, Your Honor. So in looking at Exemption 4, you have to look at those words in a textual construction of it. We'll begin by looking at the words and looking at how they were used in context at the time. And we know for Exemption 4, Congress started with a common-law term, trade secrets, which even FMI agrees. But that's another point, and I'd like to get to that, too. But when we're dealing with the word confidential, Justice Kagan made the point that perhaps there's a gloss that's been placed on it that might be inconsistent with what might appear to be its ordinary meaning. And that argument seems to me to have some strength, given the fact that Exemption 7 hasn't been treated by lower courts to bear the same gloss that you'd have us put on Exemption 4. And I'm just wondering how do you deal with that incongruity textually? Right. Well, first, we agree that the reading of the word in Exemption 7 and Exemption 4 don't have the same import. Let me explain why. So why should we give the same word two different meanings when they're virtual neighbors? First, the commonality, that even under Exemption 7, this Court didn't turn to ask the confidential source, do you think that you had a confidential relationship? Instead, they looked for objective factors. And our standard here is looking at an objective one, objective harm. Second, the fact that the same word is used in different provisions of the exemption doesn't answer it. For example, trade secrets has the word secret. But if you look at Exemption 1, it uses the word secret regarding national security matters. You wouldn't say the word secret regarding national security secrets has to be read the same as trade secrets, because trade secrets has a common law meaning. And that common law meaning — I agree. Secrets in the national security context might be different than they are in the trade secret context, but that's just not helping me with the word confidential. So perhaps there's something particular about it. Maybe there isn't. I'll let you go on. No, no. There's something particular about the Exemption 7. It talks about information — information that is furnished under a basis of — a confidential basis. So there where Congress wanted to say it was furnished on a confidential basis, it knew how to say that. That's not what it says under Exemption 4. Instead, we have Congress adopting these common law terms, trade secrets and related confidential commercial information. And when looking at those words, anew, you would look at how they were used in 1966 under the common law. And we know trade secrets required under the common law a showing of competitive harm. And for the restatement, we know that this other second box of confidential business information also required a showing of competitive harm. Breyer, what do you think about that? I mean, in reading some of these cases, it wasn't National Park so much that I think it caused the problem, but other cases that sort of run with it. That is, some say, well, the competitors have to use this in an affirmative way. And I don't know where they got that out of the statute. So would you be satisfied if we were to simply say, well, they had the right idea there. Confidential information is information that is legitimate for a confidential for a legitimate reason. It's confidential for a legitimate reason. Release would hurt the company or release would hurt the government. And then we add, and of course, there has to be harm. I mean, business-related harm to the company. Now, that would stop. I can imagine easily cases where there is information about who you sell to and who you don't sell to. And of course, you want to keep that quiet because you give the impression that every sane person in the world buys your product. And this would show that's not true. But we don't know whether people will take advantage of that or not, but they might. So it's harm. And it's legitimate. Is that good enough, in your opinion? Yes, Your Honor. So the national parks test requires a likely showing of competitive harm. And it's other cases that have gone beyond that. Likely showing of competitive harm. Maybe it's harm to business. Maybe when people find out about this, they just will stop buying it, though no new person will enter the market. I mean, I don't see the harm being any different there. And I ask the question, say, is it necessary to use, with the word harm, that word competitive, rather than a more general word like business? Business-related. Well, trade secrets, which is the brother of this category. But I'm curious if you can give me a yes or no answer, it would really help. You don't have to, but it would help. Our threshold answer is that it requires a competitive harm. But even national parks and the circuits adopting it didn't say that was hermetically sealed, and there could be other related business harms that you could show were to the same level and that should trigger. Sir, do you accept the reasonable possibility of harm test? No, Your Honor. Because Justice Breyer, in his description, said sometimes you just can't prove it, but there's a reasonable possibility of it. That has been thrown out as a why is that not enough? Under the common law and under the restatement, there was always a requirement of showing a likely competitive harm or a likely harm of sorts. So having just a reasonable possibility seems to be sort of more of a scintilla argument, which would allow so much more information here to be withheld. It's not such a strong burden to say, I'm not saying you have to show there will be actual competitive harm, just there is a likelihood of competitive harm. And that standard has prevailed for 40-some years. How is that different from substantial harm? That's the national parks test. So we think the other side overreads the word substantial. I think it's probably right to be the contrast. Is it them or other courts? I think there are a few outlier courts. But most courts have applied it as the Eighth Circuit here has distinguished between substantial and insubstantial. And here the district court found that the evidence presented by the government and by FBI to show harm was speculative at best and marginal at best. So they didn't meet whatever low standard you could articulate, but the requirement of some non-insubstantial likely harm I don't think is too high a bar to put to the private party trying to bar disclosure of the infirm. Ginsburg. One of the standards were that the agency must reasonably foresee disclosure with harm and interest protected by an exemption. That's the language of the 2016 amendment. Certainly, that applies now to all of the FOIA exemptions under the 2016 amendment. This is a pre-2016 case. But it applies to Exemption 4. It does for future cases. This case was a pre-2016 case, so it doesn't apply to this particular case. But it certainly undercuts the arguments of the government and of FMI that it's the to require a showing of harm is this requires all these trials and it's completely unadministerable when Congress not only adopted that for Exemption 4, but for all the provisions. Ginsburg. It just doesn't say competitive harm. It is a disclosure with harm and interest protected by an exemption. Right. And the courts will have to fill out what that means on an exemption, by exemption basis, and what's required and whether it's the government who believes it or it's something that's a de novo review by the court. That's something that still needs to be worked on under the 2016 amendments. And if this Court had granted a case under the 2016 amendments, I think we could talk about how it applies here. But it simply doesn't apply to this particular. May I ask, Mr. Loeb, if I were to say to you, give me your best shot on a textual argument for your position. So putting aside subsequent congressional inaction, putting aside how many courts have adopted this test. Just sort of give me your best shot for why this is the right way to read the text. What would you say? Loeb, I would say you have to look at words in context and that their neighbors inform their meaning. And as this Court has said when it's looked at other FOIA provisions, that you first looked at the common law to help inform what the language means. A plain language, they just want to look at dictionaries. But even the dictionaries are ambiguous. But the common law tells you at the time that Congress chose the word trade secrets, which has a common law meaning, which requires competitive harm. And the restatement as well said there was a second category of business information and that it was treated the same way, under the same standard, and required competitive harm. So you look at the plain language there of trade secrets and financial and commercial information that's confidential, and understand that those were terms of art that were used in the common law. And these words didn't fall from the sky and just randomly appear here. They chose common law terms, trade secrets, and the closely related commercial and confidential information. And the courts have used and the rules and the statutes have referred to those two bodies together. And if you look at this Court's decision in FMOC v. Merrill, they were all there saying, regarding a different exemption as to privileges, we're going to protect trade secrets and confidential business information. The problem I have is that the common law didn't use it the way, didn't borrow a term of art. This says trade secrets and financial and commercial materials. But that's not how the common law used it. The common law used other words like private commercial information or other sorts of words. So it's not a direct taking from the common law. No, it's not like the word fraud. And every time the word fraud is used, you would look at the common law. But this is a – it was clear that the restatement and the common law had two boxes of protected business information, trade secrets, and confidential commercial and financial information. And for both of them, they required some showing of competitive harm. It wasn't a turn on the particular unilateral view of the submitter. So I think that's – You'd agree, though, that when Congress uses words that are different from common law terms that are invested with meaning, we usually presume that it means something different. I think here the common law developed in a way where they're talking about a class of information. And it's clear that Congress is referring to that class of information. It's not – so this is not a term of art where you have like one word which triggers it. You're clearly talking about that same second box of information which has been protected by the common law and is being referred to here by the reference to commercial and financial confidential information. You'll see again and again the courts and the rules and sealing rules and the Federal Rules of Procedure likewise speak to the same classes of trade secrets and confidential business information. And all of them require some level of harm. None of them just turn on – The FDA says to a group of customers, we would like some information from you which is private. It'll help us in our business. And they say, well, no, I don't want this to get out. They say, we promise it won't. And if it ever should, we'll pay you a lot of money. Lo and behold, it's made public. It doesn't hurt them commercially in the term of competition, but it does hurt them because they have to pay a lot of money. Now, does that fall within the statute as you understand it? Well, I mean, your analogy speaks to a private party getting – a company getting private information. Yeah, yeah. And of course, that's right. And then they give it to the government and they use it and, you know, all the rest takes place as is. So there could be a breach of contract in that situation. Yeah. There was a contract and there could be damages under those contracts. Yeah. But we're talking about a class of information. Well, all right. But does the government – does that fall within the exemption? If the government gets the information, does that fall within the exemption? Because it was confidential information. The company was harmed through its release. It's just hard to say that that was competitive harm. They may have had to pay $42 million. I don't know how much, but it was harm. And it was confidential. So it's literally within the statute. And I want to know about that. I don't think it would be within the statute. The statute's referring to commercial and financial information that's obtained. Oh, it is commercial and financial information. That's what it is. I just – you go that way. I'll just assume it into my hypothetical. I'm still focusing on what words – you don't have to write this, but I might. And I have to write down something by the word harm. And that word – that word competitive harm is still giving me some trouble. And I'm – that's why I'm asking these questions. Well, it has to be obtained from a person. And you look at whether there was harm to that party who it was obtained from, which would be the company. And if it was information that pertained to the individual, it could perhaps be protected by other provisions, like the Privacy Act, to – extends to a large degree of information regarding a particular individual citizen which is possessed by the government, which then shouldn't be disclosed. So there are other exemptions that cover information which goes to private information of an individual. Here we're talking about commercial and financial information. It was enacted together with trade secrets, both being common law terms, and it would be inappropriate to sort of expand it to a global confidentiality term. Here, you know, FMI is basically suggesting a unilateral approach, that as long as they treat it as secret and confidential, that this Court should fall in line as well. That would dramatically alter the scheme of FOIA, the one which Congress has reenacted exemption for, for 26 times, again and again after there was a universal reading of this provision. First of all, FMI's counsel here says that this information isn't important, doesn't show what the government is up to. How the government spends its own money is critical information that the press and the public need to know. It's the type of information that FOIA has been used for decades to reveal, you know, the Navy spending $670 on toilet seats, to the bailout funds being abused and wasted, et cetera, et cetera. We've laid out examples in a brief. Under their test, that could all now be claimed confidential by the party, saying, look, this reveals our side of the business, two sides of the coin. You spend the money, we submit it, we did the work. We don't want you to reveal that. That would be a dramatic change of the way that FOIA has been applied for more than 40 years, also to the regulatory regime. May I ask you a question about that? Now, the circuit court was wrong about Exemption 3 under the clarification that Congress provided. So are we supposed to just ignore that? Well, we don't believe that the new version of 2018C changes the law about this case at all. It's prospective. This is information that was submitted under that amendment. And we don't think that that amendment also applies to the application process, not to the monthly and annual data that we're seeking here. But as the earlier questions pointed out, if the government wants to seek relief on remand, if you rule for us and it goes back, they can go to the district court before the information is disclosed and say, we want to reopen the judgment based on a change of the law. And we could litigate that here. That's not something to be litigated in this court, the meaning of 2018C. So I don't think that the Eighth Circuit was correct in how it read 2018C. There was no one's asking this court to review that. And the new amendment doesn't alter how this court should dispose of this case. If they want to make an argument on remand, they are free to do so. You seem to be making two distinct arguments about national parks. One is national parks is correct. Two, alternatively, is even if national parks is incorrect, we think, we should nonetheless follow it. On that second argument, how can that be squared with Milner? Again, Milner was a very different concept. It was really a judicial acquiescence to Congress not changing the law of Exemption 2. And in this Court's opinion said there wasn't a judicial consensus, so you wouldn't even assume that Congress had one way or the other. Let me take it out from under Milner, then, and just say why, if we disagree with national parks, the D.C. Circuit's decision, should we nonetheless follow it? Because this Court has long held that when Congress reenacts a statute or revises a statute that's subject to a uniform judicial construction, that you presume that Congress understands and knows of that construction and has adopted it in its ratification, in its amendment to the statute. So here you have... The construction was changed in critical mass in some significant respect, correct? Not correct, Your Honor. So critical mass was just an application of Prong 1. So Prong 1 says, look if, as to whether disclosing the information will harm the government in the future being able to get information. The D.C. Circuit applying Prong 1 came up with its voluntary involuntary test, which hasn't been followed by all the circuits. But that's just an application of Prong 1. We're saying what has been uniformly adopted, at least since 2001, is the two-prong test. One is to that first prong is to harm to the government, and the second prong is the competitive injury. So Congress has been well aware of that test, had hearings about it, saw proposals. And did they change the statute? That would be judicial acquiescence. We're not relying on it. Instead, they actually amended again and again, passed statute after statute, 29 statutes since 2001, taking the exact verbatim language of the statute and a reference to Exemption 4, and saying how it applies to different circumstances. Again, those could be ---- But that would stop this Court from saying that this Court has never, has never answered that question. And you're saying that the D.C. Circuit decision, and then other measures using the same language, stops this Court from saying what the words of Exemption 4 mean? No, Your Honor. It doesn't stop this Court. But this Court has been deferential to Congress when it looks to it, when it reenacts a statute, and there is a uniform construction, as there was here in eight, nine different uniform circuits about the two-prong test, that you know Congress knows about it, it is now reenacting the statute. And that's what this Court said this term in Helsin. There was an appellate decision, and it was they took, they reenacted that same language and put it into the American Invents Act, right? And this Court said that Congress is presumed to know the prior judicial construction and is assumed to have adopted it. So we're not saying you're in any way barred from doing it, but that's a significant factor. And when this Court has found that ratification theory applies, it hasn't even gone on to sort of look anew at the statute, because it looks, it recognizes that Congress knows about the prevailing view and has adopted it by amending the statute and not changing it, or not changing it in the relevant sense here. Does that argument depend upon how plausible this interpretation would be as a matter of first impression? Justice Alito, I don't think that that is part of the calculus. This Court has said, is there been a uniform construction? You know, and they presume Congress is aware of it. Here we know Congress was aware of it. And here we don't, we have Congress enacting 29 different statutes knowing about the uniform construction since 2001. So I mean, if there were a statute that says something has to be done within 30 days and a court said, 30 really means 50, and all the other courts fell in line, we would say, all right, that Congress has, and Congress enacts statutes related to that, we would say, well, Congress has implicitly ratified that? Obviously, that's a hard hypothetical, Your Honor. But I would say yes, that even in that context, that Congress was aware of the construction of that term. Even how bizarre it may be, here we don't have such a bizarre, you know, construction. We have the Congress adopting the common law construction. But this Court has said, in Lorillard, in Shapiro, in Helsin, again and again, that when you take language from one spot and you put it into another, reenact it, it contains the same meaning. As the ---- Alito Under the common law, was competitive harm part of the claim itself, or was it simply what you needed to show to get damages? For trade secrets, it was, in essence, a definition of what a trade secret is, something that when it's released will cause competitive harm. And the restatement said it was treating this other ---- Other things that are not trade secrets, confidential financial information that is not a trade secret. The courts treated that same confidential business information in the same respect that you had to show a competitive harm. It wasn't just injury, because you could show injury in lots of different ways. But you would have to show actually a competitive injury in the case. Is there a difference, Mr. Loeb, for purposes of this congressional ratification argument that the court at issue was not the Supreme Court, that it was instead a circuit court? What this Court has said is if there's a uniform judicial construction, that can come, of course, from the Supreme Court, and then if they take the language and reenact it or put it from this statute to that statute, you would presume that they know the Supreme Court construction. But the language of Lorillard and Shapiro and Helsin just talk about a uniform judicial construction. And we know from Helsin we had just the Federal Circuit construing the prior iteration, which was then lifted into the American Invents Act. So that principle is one really, does Congress know of that uniform construction and did it do anything about it? And here we didn't have them just reenact something once or amend the statute once, but some ---- So again, let's say we just had district courts, but we had uniform district courts saying 30 days means 50 days. That's absolutely uniform. Congress thereafter says 30 days. Everybody in America should know that that really means 50. The average person is supposed to have fair notice of the statutes, opens up the books, sees 30 days, but in fact is supposed to know that it means 50 because a lot of district courts have said so? Well, I don't think we would be, this Court or we're arguing that ---- Does that consist of fair notice or due process or any normal statutory interpretation methodology you're familiar with? In this particular case, there's not this sort of stark, it says 30 and we're reading it to be 50, and maybe that's sort of an outlier situation where you would have an exception. An exception for maybe due process and fair notice. Well, no one can argue that adopting the common law meaning of trade secrets and business information is some violation of due process, and the way that you're saying 30 days versus 50 days, I'll give you that. That's a much harder case and maybe ---- Very kind of you. Thank you. But don't our tools of interpretation normally take their cue from things like due process and fair notice rather than the other way around where due process and fair notice have to become the exception to our statutory interpretation tools? But it is an established statutory interpretation mechanism that when Congress reenacts a statute and there's a uniform construction, even if it's a uniform circuit construction, that you presume that Congress has adopted that process prior to the construction. So how many courts of appeals do you have to take? I assume uniform isn't enough. If there are just two, that's uniform. But I understand you think you have eight, right? At least eight, Your Honor. And there's no outlier circuits on the two-prong test. Is it that or are you really relying on the D.C. Circuit's special situation with respect to FOIA? With all deference to the D.C. Circuit, no. There's no special deference here. We're looking for whether there is a judicial construction in the terms of Helsin and the terms of Lower Lard. And I think when you have an overwhelming number of the circuits who have uniformly addressed it without any dissenting circuits, that whatever that standard means, that it's met in this circumstance. And it's really quite. Thank you, Mr. Young. I'm sorry, Mr. Loeb. Now, Mr. Young, you have five minutes remaining. Thank you, Mr. Chief Justice. Just a few points I'd like to make. First to start with what confidential means in its relationship to any concept of harm. That question of harm asks a very different question. It asks why someone keeps something secret, not whether they keep it secret. There is no common law term of art called confidential business information or confidential commercial information. It's not that does not appear in the restatement. It doesn't appear in the cases that are cited. It doesn't appear in any scholarship. And it wasn't something that either National Parks or any other case before or after it relied on to find some common law heritage. It's true, of course, that when one has a tort action, any kind of tort action, harm will be something that has to be shown. But that does not infuse harm into the very meaning of other elements of the tort. We know that from cases like Carter and Bruisewitz that even if there were some common law conception, it isn't enough for Congress to refer to some vague principle. You would actually have to use that term of art. Sotomayor, that begs a question, which is we sort of naturally think that if people are going to keep something confidential, that there's a reason for it. You don't just say, I don't want to disclose because I don't feel like it, although some people do. It seems to me that this concept, that there has to be a reason for it and that it has to be tied to business and to commercial and financial matters, because that's the words, financial and commercial matters. Those are the words of the statute. Doesn't that naturally infuse the concept with some sense? That there's a reason for keeping it a secret? Well, I think it's likely that there is. And if there is some sense of it, why isn't that sense infused with the concept if I let it out, it's going to hurt me? Well, again, we think the quantum of hurt. Right. But there's a reason to keep it a secret. And I will address that as well. But I think that in this very case, it maybe is a good exemplar. Of course our clients aren't paying for us to pursue this to this level because they just feel like it. Of course we think there's substantial competitive harm. But the question Congress asked is not for courts to engage in the prospective speculative assessment of what they think it is. But that's not true. If we read confidential as being confidential in nature, which is part of your definition. It's a manifestation of it. Things that are confidential in nature are likely to be kept secret. Well, that's the point. The founder of LifeLock put his social security number up on billboards all across the country to prove that his technology was so secure. Now, we wouldn't think that that is confidential anymore. It's just one manifestation of it. Everybody else's might be. And here, when you have this bucket in Exemption 4, you start with it being commercial or financial. Those are limits. Of course you're right. If you can't show that it's commercial or financial information, you're not within Exemption 4. Then you have to show it's obtained from a person. That's not the government doing it, in other words. And then lastly, it has to be confidential or privileged. And all that Congress asks the courts to do is answer the objective question, does the person whose information the government now has, does that person keep this secret and not publicly disclose it? And if so, the fact, of course, that likely the reason they do that in many instances is to protect themselves from competitive harm, that's not something that courts need to spend two days on a trial with expert witnesses and leaders from industry and all different industry segments coming in to try to persuade a poor district judge to figure out why in the world this information would cause a substantial competitive harm or not. Harm is not part of the word confidential. It's often associated with it. Why not harm? Some harm. I mean, some harm. Because Congress doesn't go around protecting people from X where X doesn't cause any harm. That would be not there in the statute, but it would be a general assumption. We object to that saying adding to that some harm. Well, I object to it in this sense. I think that by opening that door, you now are opening trial courts to have to do the kind of tedious and laborious work that leads to false negatives like this case. It really is amazing that something like store-level SNAP redemption data would lead to a situation in which we had to have a trial at all. And you wouldn't have to do it, and people aren't likely to press objections if they don't have any harm that's going to befall them. And so Congress solved that problem by saying objectively, if I may just finish the thought, Mr. Chief Justice, objectively, if you have a pattern of keeping this information secret and not publicly disclosing it, that is the only thing the Court would keep secret if it so desires. Thank you, counsel. The case is submitted.